IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THE ESTATE OF GAVIN WALLMOW, by its Special
Administrators Matthew and Michelle Wallmow,

Plaintiff,

v.                                                                          OPINION and ORDER

ONEIDA COUNTY, REED SYMONDS,                                              22-cv-241-jdp
MATTHEW TURKIEWICZ, KATIE RUDOLPH,
and CARRIE HOLEWINSKI,

Defendants.

Gavin Wallmow died by suicide while he was incarcerated at the Oneida County jail on a probation hold. Plaintiff, Wallmow's estate, contends that several members of jail staff violated Wallmow's rights under the Fourteenth Amendment to the United States Constitution by failing to take reasonable measures to prevent Wallmow's death. Plaintiff also contends that the jail had inadequate policies for mental health screening and inmate cell checks, so it also asserts a claim against the county. Defendants move for summary judgment. Dkt. 44.

Because Wallmow was a detainee, not a convicted prisoner, his claims are governed by the objective reasonableness standard under the Fourteenth Amendment. Plaintiff's claims against the individual officers turn on whether a reasonable officer in the defendant's position would appreciate the risk that Wallmow would seriously harm himself. Two days before he died, Wallmow made disconcerting statements in an interview with his probation agent: he said that he wanted to drive his car into traffic and told his probation agent that she was "talking to a dead man." But plaintiff has not adduced evidence that any member of jail staff knew about those specific statements. Jail staff knew that Wallmow had demonstrated strange

behavior during the interview. But strange behavior, without more, would not lead a reasonable officer to believe that an inmate is suicidal.

As for the claim against the county, plaintiff has not shown that jail staff had notice that their screening and cell check procedures were so plainly inadequate that they created an obvious risk that inmates would seriously harm themselves. The court will grant summary judgment for defendants and close the case.

UNDISPUTED FACTS

The court begins with an evidentiary issue. Several of plaintiff's proposed findings of fact are supported with citations to evidence that is not part of the record, in violation of Federal Rule of Civil Procedure 56(c). Plaintiff cites several depositions that were not submitted to the court. *See, e.g.*, Dkt. 75 ¶¶ 19, 20, 39, 40, 277. Defendants identified this deficiency in their response to plaintiff's proposed findings of fact, and plaintiff did not attempt to submit the missing depositions. The court disregarded any proposed findings of fact that relied on evidence outside of the record.

With that in mind, the following facts are undisputed except where noted.

Gavin Wallmow was admitted to the Oneida County jail on a probation hold just before midnight on July 4, 2021. The arresting officer from the Rhinelander Police Department gave booking officers at the jail a "gray sheet," a standardized form that includes information about the arrestee. The gray sheet asks the arresting officer to answer yes or no to whether they observed "threat of suicide," "medical problem[s]," and "violent behavior," as well as a catchall "other" category. Wallmow's arresting officer marked "no" for all four categories.

Wallmow was booked into jail by Sergeant Glenn Kortenhof. Kortenhof reviewed Wallmow's gray sheet and asked Wallmow a series of standard booking questions, including mental health screening questions. Relevant to this case, Wallmow told Kortenhof that he was not under psychiatric care, he was not feeling suicidal, he had no suicidal or self-mutilation tendencies, and he did not have any mental or physical disability. Kortenhof noted on Wallmow's intake questionnaire that Wallmow was not displaying any unusual, bizarre, or violent behavior and that Wallmow appeared to understand the questions that he was being asked. Wallmow was placed in a single-occupancy cell in a secure block pursuant to the jail's COVID-19 quarantine protocols.

Two days later, on July 6, Wallmow's probation agent, Alexis Bunce, visited the jail to obtain a written statement from Wallmow about his arrest. Initially, Wallmow seemed to be in a normal mood, and he specifically denied that he was suicidal. Bunce had learned that the police department was investigating Wallmow for allegedly sexually assaulting his sister, so Bunce asked Wallmow what had happened with his sister. Wallmow's demeanor changed after his sister was mentioned and he began laughing, crying, hitting himself, saying things that did not make sense, and saying "demonic" things. Dkt. 35 (Bunce Dep. at 9:22–25). Wallmow stated that he was going to drink his intestines out of a cup, that he felt like driving his car into traffic, and told Bunce "you are talking to a dead man," among other things. Bunce stopped taking a written statement and just listened to Wallmow to try and calm him down. Wallmow eventually stopped laughing and crying and Bunce determined that Wallmow had calmed down.

Immediately after Bunce left the jail, she called the jail on her cell phone to tell them about her conversation with Wallmow. Bunce told the officer who answered the phone,

defendant Katie Rudolph, that Wallmow was acting oddly and that she was concerned about Wallmow's mental well-being. Bunce testified in her deposition that she cannot remember whether she shared any details about her conversation with Wallmow at that time. *Id.* at 26:18–2 ("Other than I know I voiced concerns, I don't know exactly what details were said."). Rudolph testified that Bunce said that Wallmow had hit himself, was having "demonic" thoughts, and was acting strangely. Dkt. 38 (Rudolph Dep. at 17:17–22). Bunce's call to Rudolph lasted less than a minute.

Rudolph called the secure block where Wallmow was housed and told an officer stationed there that Wallmow acted strangely in an interview with his probation agent and had hit himself. Rudolph told the officer to keep an eye on Wallmow. *Id.* at 26:4–8. Officers are trained to notify the sergeant on duty if they receive any outside calls expressing concerns about an inmate, so Rudolph called defendant sergeant Carrie Holewinski to report Bunce's call. Rudolph told Holewinski that Bunce was concerned about Wallmow because she had observed him acting strangely, talking about "demonic" things, and hitting himself. *Id.* at 26:17–19.

Holewinski made a note about Rudolph's call on a "muster," which is a log used to communicate information across shifts. Specifically, Holewinski wrote: "Keep an eye on Wallmow in Secure G 3. According to his probation agent, he was acting a little weird and talking about 'demonic' stuff." Dkt. 63-4.

Two days later, on July 8, nurse Melissa Wilhelm and defendant officer Matthew Turkiewicz approached Wallmow in his cell to ask if he would like to be tested for COVID. (As part of the jail's COVID procedures, quarantined inmates could be moved into the general population if they received a negative COVID test.) Wallmow agreed to the test. Turkiewicz

and Wilhelm did not observe any odd behaviors from Wallmow, and Wallmow did not appear to be upset or distressed.

Later that same day, defendant officer Reed Symonds assumed duties as the secure pod operator for Wallmow's block. Neither party fully explains what the "secure pod" is. But the court infers from the record that the secure pod is a command center located on the first floor of the secure block. An officer can physically see into the cells on the secure block from the secure pod. But it is more difficult to see into the cells on the upper tier, where Wallmow's cell was. The secure pod also has video screens that display live footage from several security cameras placed in different areas of the jail. One of the cameras is directed at the secure cells, which allows the secure pod operator to see the cells from a higher vantage point.

The pod operator is required to perform a visual cell check from the secure pod at least once an hour. The pod operator does not leave the secure pod; rather, he or she will scan the cells from the pod either by looking into the cells or by using the security camera. In practice, pod operators were not expected to actually view every inmate during a visual cell check.

Symonds had seen Holewinski's note in the muster stating that Wallmow had been acting a little weird and talking about demonic stuff, so he reviewed Wallmow's booking information so he could identify Wallmow and see his intake form. Symonds conducted visual cell checks at 7:31, 8:10, and 9:01 p.m. and reported each time that all inmates appeared okay. Dkt. 68-12, at 2–3 (Officer Activity Log).

At 9:04 p.m., security camera footage shows Wallmow sitting on the bottom bunk in his cell. Dkt. 68-23, at 1:42.[1] At some point between 9:04 and 9:06 p.m., Wallmow hung a

---

[1]The time stamps on the video recording are inaccurate: they are ahead by 36 minutes and 37 seconds. *See* Dkt. 75, ¶ 369; Dkt. 68-13, at 2 (Incident report). That means that where the

fabric mattress cover from his top bunk, which obscured the bottom bunk. *Id.* at 2:08. At 9:07 p.m., Wallmow's legs can be seen in a kneeling position by the side of his bed. *Id.* at 2:48. Wallmow's head is obscured by the mattress cover. Wallmow then quickly extends his legs out from under him. *Id.* at 2:50. He repeats this motion a few seconds later. *Id.* at 3:04. Wallmow then holds in what appears to be a planking position, with his arms on the bed and his legs on the floor.

The footage then skips ahead by about eight minutes to 9:16 p.m. *Id.* at 3:22. It is hard to make out Wallmow's position from the video, but it appears that Wallmow is lying with his legs on the floor with his torso on the bottom bunk. His torso is partially obscured by the mattress cover. He is motionless, and he remains in the same position for the rest of the recording.

Symonds performed another cell check at 9:43 p.m. Symonds does not recall whether he saw the mattress cover hanging from Wallmow's top bunk at that time. Dkt. 37 (Symonds Dep. at 38:23–39:2).

At 9:49 p.m., Turkiewicz took over as the secure pod operator for Wallmow's block. Turkiewicz performed a cell check at 9:50 p.m. and did not report any issues. Turkiewicz saw the mattress cover hanging from Wallmow's top bunk, but he does not remember seeing Wallmow during this check. Dkt. 42 (Turkiewicz Dep. at 31:14–16).

At about 10:00 p.m., Kortenhof and Symonds entered the secure block to lock down the block for the evening. Kortenhof was responsible for checking the cells on the upper tier of

---

timestamp reads 9:37 p.m., it was actually just after 9:00 p.m. In this opinion, the court will convert the time stamps to the actual time. The footage also skips at several points. Kortenhof testified that this is because the camera records only when it senses movement. *See* Dkt. 36 (Kortenhof Dep. at 37:8–10)).

the block. When Kortenhof reached Wallmow's cell at around 10:10 p.m., he looked through the cell door window and saw Wallmow kneeling with his knees on the ground and his upper torso on the bunk. Kortenhof tried to get Wallmow's attention to complete an inmate headcount, but Kortenhof did not receive a response. Kortenhof noticed that something was around Wallmow's neck, so he opened the cell door to check on Wallmow.

Wallmow had a pair of orange uniform pants tied around his neck. The other end of the pants had been tied to a plate under the lower bunk mattress. Wallmow was unresponsive. His face was purple and there was blood coming from his nose and covering his face. Officers and EMS attempted to resuscitate Wallmow. It appeared to Symonds that some color returned to Wallmow's face, but ultimately staff could not resuscitate Wallmow.[2] Wallmow was pronounced dead at 11:36 p.m., about an hour and a half after he was found.

The court will address additional facts as they become relevant to the analysis.

ANALYSIS

Wallmow's estate asserts constitutional claims against Symonds, Turkiewicz, Rudolph, Holewinski, and Oneida County. On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*,

---

[2] Plaintiff writes in its proposed findings of fact that EMS was able to briefly establish a pulse, but the evidence cited to support that fact is not in the record. Dkt. 75, ¶ 318 (citing a missing page from Dkt. 68-17).

477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co.*, LLC, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

The court will begin with plaintiff's claims against the individual defendants before turning to the claim against the county.

## A. Claims against the individual defendants

Plaintiff contends that Rudolph, Holewinski, Symonds, and Turkiewicz violated Wallmow's constitutional rights by failing to take reasonable measures to prevent Wallmow's suicide. Although it is still unsettled whether claims brought by inmates on a probation hold are governed by the Eighth Amendment or the Fourteenth, *see Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017), the parties have stipulated that the Fourteenth Amendment applies to plaintiff's claims, *see* Dkt. 45, at 12 n.1. The court will assume that plaintiff's claims are governed by the Fourteenth Amendment.

Both sides characterize the claims against the individual defendants as ones for inadequate medical care. Plaintiff faults defendants for failing to take measures that aren't related to Wallmow's medical care, which suggests that they also mean to assert failure-to-protect claims. *See* Federal Civil Jury Instructions of the Seventh Circuit § 7.19 (2017) ("Failure to protect from self harm"). Regardless, both types of claims relate to the conditions of confinement, *Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019), so they are governed by the same substantive standards, *see id*; *see also Jump v. Vill. of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022) (applying same standard to Fourteenth Amendment medical care claim and failure to protect claim based on inmate's suicide).

The precise contours of the Fourteenth Amendment standard, however, remains unsettled. The court of appeals has provided different formulations of the standard. *Compare*

*Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (two-element test); *Gonzalez v. McHenry Cty.*, 40 F.4th 824, 827-28 (7th Cir. 2022) (four-element test); *Jump,* 42 F.4th at 792–793 (discussing only two elements). Drawing on more recent Seventh Circuit cases, the court concludes that to prevail on a Fourteenth Amendment claim related to Wallmow's suicide, plaintiff must show that: (1) the defendant made an intentional decision regarding the conditions of Wallmow's confinement; (2) those conditions placed Wallmow at substantial risk of suffering serious harm; (3) the defendant's decision was objectively unreasonable; and (4) the defendant's decision caused Wallmow's injuries. *See Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022).

The court will focus its analysis on the third element, which requires plaintiff to show that defendants' actions were objectively unreasonable. The court must assess whether defendants' actions were objectively reasonable "from the perspective of a reasonable officer on the scene, including what the officer knew at the time." *Thomas*, 39 F.4th at 842 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). To show that a defendant's conduct was unreasonable, plaintiff must show that the defendant knew, or should have known, of a serious risk of harm to Wallmow. *Thomas*, 39 F.4th at 841. Unlike a claim brought under the Eighth Amendment, there is no requirement to show that defendants subjectively appreciated that risk. *Id.* at 842. But plaintiff must show that "a reasonable officer in a defendant's circumstances would have appreciated the high degree of risk [Wallmow] was facing." *Id.* at 841; *see also Chilcutt v. City of Waukegan*, No. 19 CV 6732, 2022 WL 4466077 (N.D. Ill. Sep. 26, 2022) ("notice of the risk or condition at issue is a requirement to show that officers acted unreasonably").

Plaintiff has not adduced evidence that any defendant was aware of facts that would have led a reasonable officer to believe that there was a substantial risk that Wallmow was suicidal. Plaintiff contends that defendants "buried their heads in the sand," which suggests a willful blindness theory. But the failure to discover additional information is not willful blindness unless there is evidence that defendants took affirmative steps to avoid learning the information. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Plaintiff adduces no evidence of affirmative steps. An officer may be liable if he fails to confirm his suspicion that an inmate faces a substantial risk of serious harm. But a reasonable officer in defendants' position would not have suspected that Wallmow faced that risk in the first place, so defendants' failure to investigate Wallmow's bizarre behavior did not violate the constitution. Because the court is granting summary judgment on the merits of plaintiff's claims, it need not consider the individual defendants' arguments that they are entitled to qualified immunity.

### 1. Katie Rudolph

Defendant Rudolph was the officer who received the call from Bunce about Wallmow's erratic behavior during Bunce's interview. Plaintiff contends that there is a dispute of fact about what Rudolph learned on the call. Rudolph testified that, to the best of her recollection, Bunce told her only that Wallmow had hit himself, was having demonic thoughts, and was acting strangely; Bunce testified that she could not recall whether she shared any details beyond that Wallmow was acting strangely and she was concerned for his mental well-being. Plaintiff contends that a reasonable jury could infer that Bunce told Rudolph all of the details of her conversation with Wallmow, including that Wallmow told Bunce that she was talking to a dead man and that he wanted to drive his car into traffic.

The issue is not genuinely disputed because plaintiff has not adduced any affirmative evidence that Bunce told Rudolph about those statements. Although the court must draw reasonable inferences in plaintiff's favor, an inference is not reasonable if "the evidence supporting [plaintiff's] version of events does not rise above speculation or conjecture." *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 986 (7th Cir. 2020). Here, neither Bunce nor Rudolph testified that Bunce told Rudolph any details other than that Wallmow hit himself and was saying demonic things. Plaintiff argues that it is reasonable to infer that that Bunce shared more than that because she produced a detailed report about the conversation a few days later. But evidence that Bunce was able to remember details about the incident in preparing the report is not evidence that Bunce shared those details in her call with Rudolph. The phone call lasted less than a minute, and plaintiff has identified no other evidence that Rudolph was aware of Wallmow's specific statements of potential serious self-harm. Plaintiff can only speculate about what else Bunce may have said on the call, and speculation is not enough to create a genuine dispute of fact at summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

Plaintiff adduces no evidence that Rudolph knew facts about Wallmow other than what she learned on the phone call with Bunce. Accordingly, the record shows that Rudolph knew that Wallmow was acting strangely, having "demonic" thoughts, and hit himself.

Those facts, without more, would not lead a reasonable officer in Rudolph's position to conclude that there was a serious risk that Wallmow was suicidal. *Jump v. Vill. of Shorewood*, 42 F.4th 782, 791 (7th Cir. 2022), is instructive here. Jump, the son of inmate who died by suicide (Jonah Marciniak) while in jail, brought an inadequate medical care claim and a failure to protect claim against a police officer who arrested Marciniak and observed Marciniak in the

jail. *Jump*, 42 F.4th at 792. Jump contended that Smith, the arresting officer, had notice that Marciniak was a suicide risk for the following reasons:

- Marciniak was naked and intoxicated when Smith arrested him.

- Paramedics at the scene observed that Marciniak was emotionally distressed and recommended that Marciniak go to the hospital.

- Officers arrested Marciniak on the belief that he had just pushed his roommate out of a fourth-floor window during a domestic dispute; Smith believed that Marciniak and his roommate were in an intimate relationship.

- Marciniak cried, repeatedly asked to see his roommate, and asked if his roommate was okay.

- Marciniak told Smith that he had past psychiatric treatment.

- Marciniak was visibly distressed in his cell and slammed his body against the cell bars.

- Smith knew that Marciniak overdosed on heroin within the past week.

*Id.* at 787, 796–97.

Applying the Fourteenth Amendment's objective unreasonableness standard, the court of appeals concluded that Smith had not acted unreasonably.[3] It reasoned that the facts known to Smith would not lead a reasonable officer in his position to believe that Marciniak was a suicide risk because, "[m]ost dispositively, we have no facts that Marciniak told Sgt. Smith or [another officer] that he was suicidal." *Id.* at 793–94. Marciniak's distress and his history of psychiatric treatment, without more, did not provide notice that Marciniak was suicidal. *Id.* at 794. Because "Marciniak never gave Sgt. Smith reason to think Marciniak might attempt

---

[3] The court declined to decide whether Marciniak's claims were governed by the Fourth Amendment (as an arrestee) or the Fourteenth (as a pretrial detainee) because claims "are analyzed via the objective reasonableness standard" under both amendments. *Id.* at 793.

suicide," it was reasonable for Smith to not take any additional precautions to prevent Marciniak from harming himself. *Id.*

The same conclusion applies in this case. Like the officer in *Jump*, Rudolph was not aware that Wallmow had made any statements to suggest that he was suicidal. Rudolph knew that Wallmow was acting strangely and saying demonic things, but those statements are too vague to give a reasonable officer notice that Wallmow would harm himself. As the court of appeals has repeatedly held in the Eighth Amendment context, bizarre behavior alone does not put officers on notice that an inmate is suicidal. *See Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003); *Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001) ("Bizarre behavior and suicidal behavior are different."). Rudolph also knew that Wallmow had engaged in minor self-harm by hitting himself. But Marciniak had engaged in similar self-harm by "slamming his body against the cell bars," which the court concluded was only a "general sign of distress" and was not evidence that Marciniak would commit suicide. *Jump*, 42 F.4th at 793.

This case differs from *Jump* because the officer in that case knew that Marciniak had expressly stated that he was not suicidal when the arresting officer completed Marciniak's intake form. Wallmow also stated that he was not suicidal at intake, but there is no evidence that Rudolph knew Wallmow had made that assurance. But that difference is immaterial. Most important is that in both cases, there is no evidence that the inmate told officers that they *were* suicidal. Indeed, the facts in *Jump* are, if anything, more worrying than those known to Rudolph. The officer in *Jump* personally observed Marciniak's behavior. Marciniak was not just acting strangely; he was visibly distraught and worried about the well-being of his partner. And the officer in *Jump* knew that Marciniak had a history of psychiatric treatment. Rudolph, by

contrast, had no other information about Wallmow's mental health treatment history, and she did not personally observe any peculiar conduct.

A reasonable officer in Rudolph's position would not appreciate that Wallmow posed a substantial risk of serious harm to himself. Under the circumstances, Rudolph's response to Bunce's phone call was reasonable. Rudolph called both Ian Conkey, the officer manning the secure pod in Wallmow's block, and Holewinski, the sergeant on duty, to tell them about the call and that Wallmow had been acting strangely. She also told Conkey to keep an eye on Wallmow. Plaintiff contends that Rudolph's response was inadequate because she could have alerted mental health staff about Bunce's concerns. But "when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions" to prevent that harm from occurring. *Jump*, 42 F.4th at 793.

Plaintiff makes two additional arguments why Rudolph's response was unreasonable: (1) Rudolph should have asked Bunce for additional information about what Wallmow said and did during the interview; and (2) Rudolph did not communicate all of the information she knew to Conkey or Holewinski.

As for Rudolph's failure to follow up with Bunce, an officer may be liable for failing to confirm their suspicions that an inmate is at risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994). But the facts known to Rudolph would not lead a reasonable officer in her position to suspect that Wallmow faced that sort of risk, so Rudolph did not have a constitutional duty to inquire further.

As for Rudolph's failure to accurately communicate the information she learned from Bunce, plaintiff seizes on purported inconsistencies between the testimony of Rudolph, Conkey, and Holewinski. Specifically, Rudolph testified that she told Conkey and Holewinski

14

that Wallmow had hit himself; Conkey could not recall whether Rudolph shared that detail, Dkt. 39 (Conkey Deo. At 13:3–5), and Holewinski testified that she did not learn that Wallmow had hit himself until after Wallmow had died, Dkt. 43 (Holewinski Dep. at 11:25–12:7). Plaintiff contends that Rudolph lied in her deposition about whether she shared this detail with Conkey and Holewinski and that it was unreasonable for her not to share this information.

Even if the court assumes that Rudolph failed to communicate this information to Holewinski and Conkey, that would not show that Rudolph violated Wallmow's Fourteenth Amendment rights. The fact that Wallmow hit himself, either alone or considered with his other strange behavior, would not put a reasonable officer on notice that Wallmow was at risk of suffering serious harm. Plaintiff also fails to adduce evidence that any omission was deliberate. Actions made by mistake do not violate the Fourteenth Amendment. For example, a taser that went off by accident cannot support an excessive force claim, *Kingsley*, 576 U.S. at 396, and a plaintiff cannot bring a constitutional medical care claim against a nurse who mistakenly mixed up the plaintiff's chart with another detainee's, *Miranda v. Cty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018). Nothing in the record suggests that any omission was intentional, as opposed to merely negligent.

The bottom line is that plaintiff has not shown that a reasonable officer in Rudolph's position would have realized that there was a substantial risk that Wallmow would harm himself. *See Pulera*, 966 F.3d at 554 ("[defendant] was not even negligently responsible for a suicide risk that [plaintiff] never told her about.") Rudolph's response to Bunce's call was reasonable, so she is entitled to summary judgment on plaintiff's claim against her.

## 2. Carrie Holewinski

In response to Rudolph's call, Holewinski made a note about Wallmow on the muster, which is used to communicate information between shifts. Specifically, Holewinski wrote "Keep an eye on Wallmow in Secure G 3. According to his probation agent, he was acting a little weird and talking about 'demonic' stuff." Dkt. 63-4. Plaintiff contends that in response to Rudolph's call, Holewinski should have reached out to Bunce or spoken to Wallmow directly to learn more information about any potential mental health issues.

The claim against Holewinski fails because plaintiff has not shown that a reasonable officer in Holewinski's position would appreciate a substantial risk that Wallmow would seriously harm himself. It is unclear from the record whether Holewinski knew that Wallmow had hit himself. But even if the court assumes that Holewinski knew everything that Rudolph did—that Wallmow was acting weird, talking about demonic stuff, and had hit himself—that information would not put Holewinski on notice that Wallmow was suicidal for the same reasons that it did not put Rudolph on notice.

Plaintiff provides an additional argument for why Holewinski's response was unreasonable. It identifies testimony from Holewinski that if she had known that Wallmow was hitting himself, in addition to his other strange behavior, she "probably would go make contact with that person to find out what's going on." Dkt. 43 (Holewinski Dep. at 11:19–12:7). In a similar vein, a jail nurse testified that if an inmate was "hitting himself in the face or head," she would assess that inmate for any mental health concerns. Dkt. 40 (Wilhelm Dep. at 18:7–25). Plaintiff contends that this testimony shows that Holewinski knew, or should have known, that Wallmow's behavior required some sort of mental health evaluation.

Even if Holewinski knew that Wallmow had hit himself, Holewinski's testimony about what she would normally do in that situation does not establish the constitutional standard. Holewinski's testimony shows that it may be prudent to investigate reports of strange behavior, but the constitution does not require jails to adopt best practices. *See Mays v. Dart,* 974 F.3d 810, 823 (7th Cir. 2020). And even if jail policy required Holewinski to follow up with Wallmow, a policy violation does not violate the Constitution. *See Pulera v. Sarzant,* 966 F.3d 540, 551 (7th Cir. 2020) (citing *Thompson v. City of Chicago,* 472 F.3d 444, 454 (7th Cir. 2006)). "The only question that matters" is whether Holewinski violated the Fourteenth Amendment. *Id.* That question turns on whether a reasonable officer would appreciate the risk that Wallmow would commit suicide. And, for the reasons explained above, the fact that Wallmow was hitting himself, alone or together with his other strange behavior, would not put an officer on notice of that risk.

It was reasonable for Holewinski to respond to Rudolph's call by recording the information in the muster and informing staff to keep an eye on Wallmow. Holewinski is entitled to summary judgment on plaintiff's claims against her.

### 3. Symonds and Turkiewicz

Symonds and Turkiewicz were assigned to monitor Wallmow's cell block on July 8, the night that Wallmow died. The court will address their claims together because they had similar responsibilities, and plaintiff makes similar arguments on their claims against both defendants.

Prior to their shifts, Symonds and Turkiewicz both saw Holewinski's July 6 note in the muster that Wallmow was acting "a little weird" and saying "demonic" stuff, and that staff should keep an eye on him. Turkiewicz had also interacted with Wallmow earlier that day when Wallmow was tested for COVID, and Turkiewicz did not observe any odd behavior from

Wallmow during that encounter. For the reasons explained above, the information in the muster, without more, would not lead a reasonable officer to believe that Wallmow was suicidal.

But plaintiff contends that a reasonable officer in Symonds and Turkiewicz's position would realize that Wallmow was suicidal because they observed Wallmow behaving oddly in his cell. Specifically, it argues that both Symonds and Turkiewicz observed that (1) Wallmow had hung a mattress cover from his top bunk and obscured his bottom bunk, in violation of jail rules; and (2) Wallmow was lying in an odd position by his bed after he tied his pants around his neck. Plaintiff also states that Symonds saw Wallmow kicking his feet out from underneath him prior to his death.

It is undisputed that Turkiewicz saw Wallmow's mattress cover hanging from the top bunk. But neither side has adduced evidence that Turkiewicz saw Wallmow in an odd position. Turkiewicz testified that he did not see Wallmow during his cell check. Plaintiff contends that a reasonable jury could nevertheless conclude that Turkiewicz saw Wallmow when he performed a visual cell check. But the record shows that officers were not expected to actually view every inmate during a check. Indeed, that widespread practice is the basis for one of plaintiff's claims against the county, which is discussed in the next section. As for Symonds, the parties adduce no evidence that Symonds observed *any* of the behaviors plaintiff identifies. In his deposition, Symonds reviewed security camera footage of Wallmow's cell and testified about what he observed on the video. But both sides cite his testimony about what he saw on the video to support facts about what he actually observed the night Wallmow died. *See, e.g.,* Dkt. 74, ¶¶ 115, 118 (defendants' proposed findings of fact); Dkt. 75, ¶¶ 287, 292, 293 (plaintiff's). Neither side identifies testimony from Symonds that he saw Wallmow hang a

mattress cover from his top bunk, kneel on the floor, or kick his feet out from under him. Despite this, both sides assume that Symonds saw all of those things. *See* Dkt. 45, at 23 (defendants' brief).

Even if the court assumes the same for the purposes of summary judgment, Wallmow's behavior would not lead a reasonable officer to believe that Wallmow was suicidal. Viewed in hindsight, Wallmow's actions in his cell are disturbing and tragic. But at the time, Symonds and Turkiewicz knew only that Wallmow had been acting "a little weird." They had no reason to believe that Wallmow was suicidal. Against that background, Wallmow's behavior was not so concerning that it would put a reasonable officer on notice that he was preparing to die by suicide. *See Mathis v. Fairman*, 120 F.3d 88, 91–92 (7th Cir. 1997) (odd behavior alone did not put officers on notice that a detainee was at risk for suicide when the officers were unaware of detainee's suicidal tendencies).

Wallmow's movements on his bed and the floor are odd, but it does not appear that Wallmow is trying to harm himself. Similarly, Wallmow's kneeling position by the side of his bed is somewhat unusual. But a reasonable officer viewing the security camera footage would not suspect that Wallmow was harming himself. Wallmow's neck cannot be seen. Wallmow's torso is leaning on the bed; he is not splayed out on the floor. He is not visibly hanging from the bed or any other structure. A reasonable officer could believe that Wallmow was praying, writing a letter on his bed, or sleeping in an odd position. Nothing in his position or movement clearly suggested self-harm.

As for the mattress cover obscuring Wallmow's bottom bunk, hanging a sheet from an inmate's bunk violates the rules. But plaintiff adduces no evidence that obscuring the bottom bunk demonstrates that an inmate is likely to harm himself. Several officers testified that it

was not uncommon for inmates to hang sheets from their bed out of a desire for privacy or to block out light. *See* Dkt. 36 (Kortenhof Dep. at 38:2–4) ("We have inmates try to block their bunks like that a lot"); Dkt. 37 (Symonds Dep. at 42:19–23); Dkt. 38 (Rudolph Dep. at 28:13–16). The mattress cover did not obscure the entire cell window, so officers could still see inside. And plaintiff cites no cases where similar behavior put officers on notice that an inmate was suicidal. Without the knowledge that Wallmow had made suicidal statements earlier that week, Wallmow's behavior in his cell was not so concerning that "the consequences of the defendant's inaction [was] obvious." *Thomas*, 39 F.4th at 841.

Plaintiff contends that the facts known to Symonds and Turkiewicz would, at minimum, lead a reasonable officer to "strongly suspect that something was afoot in Wallmow's cell." Dkt. 64, at 23. It argues that Symonds and Turkiewicz should have checked in on Wallmow and that they "played ostrich" by allowing Wallmow to obscure his bunk. But plaintiffs have not shown that a reasonable officer in Symonds and Turkiewicz's position would suspect that Wallmow was likely to seriously harm himself. Officials may not "simply bury their heads in the sand [] when there was a strong reason to believe that a prisoner was in danger." *LaBrec v. Meeker*, 345 F. Supp. 3d 1040, 1044 (W.D. Wis. 2018). But the facts known to Symonds and Turkiewicz would not put a reasonable officer on notice that Wallmow was at risk, so they did not violate Wallmow's rights by failing to investigate that risk. Officers are not required to confirm or deny suspicions that a reasonable officer would not have.

Symonds and Turkiewicz were not models of diligence. Despite Holewinski's note in the muster, it does not appear that Symonds or Turkiewicz made any special effort to "keep an eye" on Wallmow. They conducted only their scheduled visual cell checks, which were not thorough. And they did not stop Wallmow from obscuring his bottom bunk, even though

inmates are not allowed to hang anything off their beds. But failing to follow instructions or enforce prison policy does not itself amount to a constitutional violation. Because a reasonable officer in Symonds's and Turkiewicz's position would not appreciate the risk that Wallmow would harm himself, their decisions about how they monitored Wallmow did not violate his rights under the Fourteenth Amendment. Symonds and Turkiewicz are entitled to summary judgment on plaintiff's claims against them.

## B. Claim against the county

Plaintiff asserts a constitutional claim against Oneida County. Municipalities such as the county are liable for constitutional violations arising from their policies or customs. *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 616 (7th Cir. 2022). To prevail on a claim against the county, plaintiff must have evidence of (1) an action pursuant to a municipal policy or practice, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the moving force behind the constitutional injury. *Pulera*, 966 F.3d at 550 (internal quotation marks omitted). Individual liability is not always a prerequisite for municipal liability. *Id.* (citing *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc)).

Plaintiff identifies two practices that it contends are constitutionally deficient. The first is what plaintiff calls the "keep an eye on" policy. If an inmate displays "bizarre behavior" at booking, the officer checks the "bizarre behavior" box on the screening form. All screening forms were automatically forwarded to medical staff. But if an inmate displays odd or bizarre behavior after booking, sergeants have discretion whether to (1) refer the inmate to medical staff or (2) instruct officers to "keep an eye on" the inmate. Plaintiff contends that this practice was inadequate because it kept medical staff out of the loop and because directing officers to

"keep an eye" on an inmate is too vague to be effective. Second, plaintiff contends that the jail's visual cell check policy is inadequate because it does not require officers to actually view every inmate.

The parties focus on the second and third elements for municipal liability: whether policymakers were deliberately indifferent to a known risk that these policies would lead to a constitutional violation and whether these policies caused a constitutional injury. The county has creditable arguments for why plaintiff has not adduced evidence to prove either element, but the court will focus on whether the policymakers were deliberately indifferent to known risks to inmate safety.

To show that the county was on notice that a policy was constitutionally inadequate, plaintiff must show either (1) a prior pattern of similar constitutional violations resulting from the policy; or (2) that the policy is so plainly inadequate that the risk that it would lead to a constitutional violation was obvious. *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530–31 (7th Cir. 2022). Plaintiff concedes that it cannot show a pattern of suicides at the jail, Dkt. 64, at 30, so it must adduce evidence that the policies were so obviously inadequate that the county was effectively on notice that an inmate like Wallmow would kill himself. It is only under "rare circumstances" that a policy is so obviously inadequate that a single incident can give rise to liability based on that policy. *Helbachs Café*, 46 F.4th at 531.

Plaintiff has not met that burden. As for the "keep an eye on" policy, even an inadequate policy about what to do when an inmate demonstrates "bizarre" behavior would not create an obvious risk that inmates would seriously harm themselves because "bizarre behavior and suicidal behavior are different." *Jutzi-Johnson*, 263 F.3d at 757. What matters is how officers

responded to inmates demonstrating *suicidal* behavior. Plaintiff adduces no evidence that jail staff fails to respond appropriately to signs that inmates are likely to seriously harm themselves.

As for the jail's cell check policy, the policy that officers are not required to view every inmate during every check does not create an obvious risk that inmates will seriously harm themselves, for two reasons. First, plaintiff adduces no evidence that this policy applies to inmates actually on suicide watch. Jail staff are trained to place inmates who demonstrate suicidal behavior on suicide watch. Even if the jail inadequately monitored inmates in the general population, there is no evidence that staff fails to monitor inmates who are likely to harm themselves. Second, the record shows that staff monitored inmates in the general population in other ways, in addition to the hourly visual cell checks. Defendants adduced evidence that sergeants and other staff performed "routine" walkthroughs where they would walk by each cell. Dkt. 47, ¶ 35–37. Officers also performed five headcounts per day, which required officers to personally observe each inmate. *Id.* at ¶ 39. Plaintiff does not develop any argument why the jail's policies about monitoring inmates in general population are inadequate in light of these additional checks.

Plaintiff provides no authority that similar policies have been found to be obviously inadequate. In the only case plaintiff cites on this issue, *White v. Watson*, No. 16-cv-560-jpg-dgw, 2018 WL 2047934, *11 (S.D. Ill. May 2, 2018), the inadequate policy was a widespread practice of "ignoring suicide threats." That policy is far more egregious than the policies that plaintiff has identified in this case, and the risk of harm it poses is much more obvious. Plaintiff has not shown that Oneida County had notice that its policies were inadequate, so the county is entitled to summary judgment on plaintiff's claims against it.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, Dkt. 44, is GRANTED. The clerk of court is directed to enter judgment for defendants and close the case.

Entered May 18, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge